DECISION
This matter is before this Court pursuant to limited objections to the Examiner's Report and Recommendation filed by the Permanent Receiver of Abbott Street Realty, Inc. and The Standard Nut Bolt Company f/k/a FRMC Acquisition, Inc.
For the reasons set forth in this Decision, this Court adopts the Examiner's Report and Recommendation in part and rejects it in part.
 I. FACTS AND TRAVEL
Before the sale of its assets, Abbott Street Realty, Inc. (the "Seller") owned and operated The Standard Nut Bolt Company located at 49 Abbott Street in Cumberland, Rhode Island. On November 15, 2000, Seller entered into a Purchase Agreement with The Standard Nut Bolt Company f/k/a FRMC Acquisition, Inc. (the "Buyer") in which it agreed to sell substantially all of its personal property assets to Buyer. The assets included items defined in § 2.01 of the Purchase Agreement and consisted mostly of machinery, equipment, inventory, accounts *Page 2 
receivable, certain intangibles, and other items. The closing on that sale occurred on January 5, 2001. Five years later, in September 2003, E. Jerome Batty petitioned Seller into receivership.[1]
Seller wanted to close the transaction as soon as possible, but Buyer preferred to wait until 2001 to do so. The parties agreed that, in the meantime, Buyer would assume the day-today operations of The Standard Nut Bolt Company as of November 1, 2000, and that the consideration to be paid by Buyer to Seller for the purchased assets would be determined as if the closing had taken place the day before, on October 31, 2000; the actual closing would not occur until early January 2001.
Under the Purchase Agreement, Buyer agreed to pay $450,000 in cash for Seller's personal property assets and to deliver to Seller a $100,000 interest-deferred promissory note due one year after the closing (the "Note"). In addition, Buyer agreed to pay a dollar-for-dollar amount for all "Eligible Accounts Receivable," which were defined in the Purchase Agreement. Section 5.06(d) of the Purchase Agreement stated:
 The Accounts listed on Schedule 5.06(d) as of October 31, 2000 are less than 90 days old ("Eligible Accounts Receivable"). All of the Eligible Accounts Receivable are fully collectible, without setoff or deduction. All of the Accounts arose from bona fide transactions in the ordinary course of Seller's business, consistent with past practices, and represent accounts validly due for goods sold or services rendered or validly incurred indebtedness on the part of those obligated thereon.
This provision of the Purchase Agreement and its purchase price structure is central to the parties' dispute. If an item were classified as finished goods inventory as of the October 31, 2000 cutoff date, then Buyer would owe no additional funds for that item. In contrast, if an item were classified as an "Eligible Accounts Receivable" on that cutoff date, then Buyer would have to pay an additional dollar-for-dollar amount for that item. The parties also agreed that the Note *Page 3 
would be subject to certain setoff provisions outlined in the Purchase Agreement under § 3.05, [2] the purpose of which was to deal with any claims or adjustments, all of which the parties anticipated would be resolved well in advance of January 2, 2002 — the date that the Note was due (one year after closing) and began to accrue interest.
Yet, most of the parties' claims and adjustments were not resolved within one year following the closing. Indeed, they remain unresolved to date. The primary dispute between the parties is whether $41,362 of items that had been prepared for shipment from the Cumberland, Rhode Island premises on the October 31, 2000 cutoff date, but were not actually shipped until early November 2000, were finished goods inventory for which no additional payment was due, as Buyer maintains, or were included in the "Eligible Accounts Receivable" for which additional payment by Buyer was required, as Seller maintains.
An examination of the deposition testimony indicates that numerous discussions ensued before and at the closing relating to the "Eligible Accounts Receivable" and whether the $41,362 amount was included in the accounts receivable figure. On January 2, 2001, three days before closing, an issue arose regarding the line item figure of $322,347 for "Eligible Accounts Receivable" appearing on a proposed closing sheet. Buyer's attorney placed an asterisk next to that figure to indicate that those items were subject to post-closing verification and then faxed the form to Seller's attorney. The next day, after Seller's attorney responded to the fax, Buyer's attorney removed the asterisk next to the "Eligible Accounts Receivable" figure of $322,347. At the closing, the parties then signed an Amendment to the Purchase Agreement which consisted *Page 4 
of an itemization of and adjustments to components of the purchase price and included a line item of $322,347 for "Eligible Accounts Receivable."
Further correspondence took place between the parties' attorneys in which Seller suggests that an agreement was reached with Buyer's principal, Timothy Csanadi, that certain accounts receivable on the October 31, 2000 balance sheet included goods that had been prepared for shipment but not actually shipped on or before that date and that if those items were not included in accounts receivable, this would result in a windfall to Buyer. In contrast, Mr. Csanadi testified at his deposition that while he did approve the figure of $322,347 for "Eligible Accounts Receivable," he did not recall any specific windfall discussion in which he agreed that this figure included products that were ready to be shipped. Further, Buyer's attorney testified that although she removed the asterisk next to the figure of $322,347 for "Eligible Accounts Receivable," she believed that Paragraph 5 of the Amendment to the Purchase Agreement — that provides that the Purchase Price calculation as set out in the itemized list of adjustments to the purchase price components was the "Purchase Price Calculation as of the Closing, subject to adjustments if any, as set forth in the Agreement or in this document" — left open the possibility of post-closing adjustments.
After the closing, the parties' respective attorneys attempted to determine the amount of purchase price adjustments pursuant to § 3.01(c) of the Purchase Agreement. That section provides, in part:
 The Seller and the Buyer agree that the intent and purpose the adjustment to the Purchase Price as described in this Section 3.01(c) is to place the Seller in the identical financial situation as if the Closing actually occurred on October 31, 2000. Seller's financial statement of the Business as of October 31, 2000 (including a balance sheet and income statement) is set forth on Schedule 3.01(c)(vi) ("10/31/00 Financial Statement ") and the 10/31/00 Financial Statement will be utilized by the Seller and the *Page 5 
Buyer in making the adjustments prescribed by this section. If the Seller and the Buyer cannot agree on the appropriate adjustment to the Purchase Price pursuant to this Section 3.01(c), then their respective accountants shall attempt to reach agreement on the appropriate adjustment. If the respective accountants cannot agree, then the respective accountants shall mutually select a third accountant, whose determination on the appropriate adjustment to the Purchase Price shall be final and binding on both the Seller and the Buyer. The Seller and the Buyer shall use best efforts to have all issues relating to the adjustment to the Purchase Price resolved within 30 days of Closing, and any payments due as a result of said adjustment to the Purchase Price shall be paid by the Seller or the Buyer as applicable within five (5) days of the final resolution.
The parties' accountants discussed and reviewed the adjustments and appeared to agree to a purchase price adjustment in favor of Buyer in the amount of $52,238. On May 9, 2001, Buyer's attorney sent a letter to Seller providing notice of a claim for setoff for Uncollected Eligible Accounts Receivable in the amount of $4,250.87 and demanding payment of $52,238. Seller's attorney informed Buyer that it did not intend to pay that amount, that Seller's accountant did not have the authority to undertake the accounting work, and that the accountant's calculations did not take into account the parties' alleged oral agreement that the figure of $41,362 was included in the "Eligible Accounts Receivable." Following a tortured and protracted course of attempted arbitration and litigation, [3] E. Jerome Batty, in his capacity as a shareholder of Abbott Street *Page 6 
Realty, Inc., filed a voluntary petition for appointment of a Receiver on September 30, 2003. The Court appointed Joseph P. Ferrucci, Esq. as a Permanent Receiver on October 7, 2003. After about two years had passed and the Receiver had not filed a recommendation of allowance or disallowance of Buyer's claim, Buyer's counsel took the position that the Receiver was acting more as Seller's advocate than as an impartial receiver. To avoid litigating this issue, the Court entered a consent order July 21, 2008, appointing Matthew J. McGowan as Examiner. With the agreement of the parties, he was directed to file a report with the Court, after an investigation, recommending the allowance or disallowance, in whole or in part, of the unresolved claims filed by Buyer, including the issue of whether the items valued at $41,362 were accounts receivable included in "Eligible Accounts Receivable." The Examiner also was asked to determine the related issues of whether and to what extent interest should be allowed on what Seller characterizes as "undisputed" amounts owed under the Note as well as the allowance of attorney's fees.
After conducting his analysis, the Examiner prepared his Report[4] in which he found that there was no meeting of the minds and consequently no oral agreement between the parties that the $41,362 amount of items that had been prepared for shipment but had not actually been *Page 7 
shipped as of October 31, 2000 were accounts receivable included in the $322,347 figure listed as "Eligible Accounts Receivable" in the Amendment to the Purchase Agreement. He determined that those items were finished goods inventory such that the amount of $41,362 is a valid Buyer setoff from the amounts due by Buyer to Seller under the Note. As the parties agreed at the time that the Examiner filed his report that items totaling $15,126.87 were appropriate and valid setoffs against the $100,000 Note, the Examiner recommended that the sum of $15,126.87 be added to the $41,362 amount for a total allowable setoff by Buyer of $56,488.87 that, when deducted from the $100,000 Note, left a balance of $43,511.13 due from Buyer to Seller.
In addition, the Examiner found that since the sum of $43,511.13 was an undisputed amount that Buyer should have paid, but failed to pay under the Note, Seller is entitled to interest on that amount. According to the Examiner, interest should accrue from January 5, 2002 at a rate of 18% through August 18, 2006, bringing the total due by Buyer under the Note to $79,407.84, inclusive of interest, as of August 18, 2006.
Concerning attorney's fees, the Examiner recommended that, except for those attorney's fees incurred by Buyer in connection with its Superior Court action commenced on June 16, 2001, 73.22% of Buyer's reasonable attorney's fees incurred in its Purchase Agreement dispute with Seller are recoverable and should reduce the $79,407.84 amount owed by Buyer. The Examiner further determined that Seller is entitled to its reasonable attorney's fees under the Note for those fees incurred in connection with its February 2002 Superior Court action in which it sought to collect under the Note and that those fees should be added to the net amount payable by Buyer. *Page 8 
 II. STANDARD OF REVIEW
The appointment and use of masters by this Court is regulated by Rule 53 of the Rhode Island Rules of Civil Procedure. Section (e)(2) of Rule 53 deals specifically with the reports of masters in non-jury actions. In such an action, since "the Master is essentially supplanting the trial judge as the finder of fact, the Master's findings are entitled to substantial weight."Dickinson v. Killheffer, 1982 WL 609164 *3 (R.I. Super. 1982). Additionally, section (a) of Rule 53 defines "master" to include "a referee, an auditor, an examiner and any other individual or entity possessing such special expertise sufficient to serve the purpose or purposes for which a master may be appointed under this rule." (Emphasis added.) Consequently, according to section (e)(2) of Rule 53, "the court shall accept the master's [or examiner's] findings of fact unless clearly erroneous." Seealso Town of Barrington v. Williams,972 A.2d 603, 609 (R.I. 2009) (holding that in a non-jury action where a special master [or examiner] has been appointed, the trial justice "shall accept the master's findings of fact unless clearly erroneous").[5] That section further explains that the court, after hearing, "may adopt [the report] or may reject it in whole or in part." R.I. Super. Ct. R. Civ. P. 53(e). With respect to a master or examiner's legal conclusions, the court must decide those issues of law de novo. See id., Compiler's Notes (h).[6] In reviewing the Examiner's Report in the case at bar, therefore, this Court, with the consent of the parties, will apply the standard set forth in Rule 53. HNY Holding Co., Inc. v. Danis Transp. *Page 9 Co., Inc., 2004 WL 2075158 * 8 (R.I. Super. 2004) (Court examined the Receiver's conclusions of law on a de novo basis and the Receiver's findings of fact for clear error).
 III. ANALYSIS A. The Receiver's Limited Objection to the Examiner's Factual Findings
In its limited objection, the Receiver takes the position that the facts developed by the Examiner establish, as a matter of law, that the parties reached an agreement before the closing on January 5, 2001 that the accounts receivable figure totaled $322,347, and included the $41,362 amount claimed by Buyer, even though those items had been prepared for shipment but not actually shipped until after October 31, 2000, such that the $41,362 amount is due and owing to Seller. The Examiner, however, recommends a finding in favor of Buyer on the disputed accounts receivable issue with respect to the $41,362 amount. The Receiver's basis for disputing the Examiner's findings is that the chronology of events that took place just before the closing establish that Buyer's principal, Mr. Csanadi, authorized his attorney to close the transaction based on an accounts receivable figure of $322,347 while being fully aware of the ongoing dispute concerning characterization of the $41,362 amount. The Receiver suggests that the facts found by the Examiner establish, as a matter of law, that there was an oral agreement reached between Seller and Buyer before closing that Buyer still owed Seller an additional $41,362 in accounts receivable.
In making this argument, the Receiver tries to "dress [] quintessentially factual matters in the garb of `legal error.'"Crellin Technologies, Inc. v. Equipmentlease Corp.,18 F.3d 1, 7 (1st *Page 10 
Cir. 1994). "But factual issues are demonstrably different than legal issues, and no amount of slick costumery can transform the one into the other." Id.
"So long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences," the question of whether the parties here mutually assented to a contract term, or reached a meeting of the minds, "is a question of fact to be determined by the fact finder," . . . "subject to clear-error review." Id. (citations omitted). Even if that question is characterized as a mixed question of law and fact, [7] to the extent that it is fact-dominated, it is still subject to the clearly erroneous standard of review. Id.; see alsoTedesco v. Connors, 871 A.2d 920 (R.I. 2005) (the question of duty is for the court but the duty-triggering facts are for the jury to decide unless there is no dispute as to the predicate facts);Wickes Asset Management, Inc,. v. Dupuis,679 A.2d 314, 317 (R.I. 1996) (resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference) (citations omitted)). The factual findings of the Examiner should not be disturbed on review absent a showing that he "overlooked or misconceived material evidence or was otherwise clearly wrong." Technology Investors v. Town of Westerly,689 A.2d 1060, 1062 (citing Rego Displays, Inc. v. Fournier,379 A.2d 1098, 1100-01 (R. I. 1977)).
In this case, there was a genuine factual dispute between the parties as to whether they had an agreement that the disputed items totaling $41,362 that had been prepared for shipment but not actually shipped as of October 31, 2000 were accounts receivable and included in the $322,347 figure for "Eligible Accounts Receivable." The Examiner met and exchanged communications with the parties' attorneys, reviewed the parties' submissions, and considered the deposition testimony of key witnesses, including the parties' attorneys and accountants, *Page 11 
before determining that no such agreement had been reached. He pointed out that no party or individual could refer to a specific time, setting, or event at which Buyer agreed: (1) that the $322,347 figure included the $41,362 amount; (2) such amount could never be challenged as not being a receivable; and (3) that it had waived the warranties and representations that such items comprising the "Eligible Accounts Receivables" figure of $322,347 were, in fact, receivables as of October 31, 2000. While acknowledging that there were discussions between the parties' attorneys on these issues before closing, the Examiner was convinced there was no agreement or meeting of the minds between the parties as to payment for the disputed items. He found that Seller advanced the notion that an agreement had been reached to attempt to support its argument that Buyer still owed $41,362 to the receivership estate.
After carefully considering the record, including the evidence received by the Examiner, the written objections, the supporting memoranda, and the parties' oral arguments, this Court determines that the Examiner correctly applied basis precepts of contract law and that his finding as to the absence an agreement between the parties was not clearly erroneous. This Court is satisfied that the Examiner considered and weighed all of the conflicting evidence and testimony before him in deciding that no agreement had been reached between the parties. There is no indication that he disregarded or overlooked any material evidence or testimony.
In addition, this Court "must exercise restraint in tampering with findings that are substantially or totally based merely on the credibility of witnesses who appeared before the [Examiner]."Dickinson, 1982 WL 609164 *4. In this case, an examination of the deposition testimony available reveals genuine uncertainty as to the issues of who knew what and what was said and agreed upon. By way of example, Seller's attorney, Mr. Gasbarro, testified at one point that he had used the term "windfall" with Buyer to indicate Seller's concern that Buyer would *Page 12 
receive a windfall if it did not pay additional money for the items that had not been shipped as of October 31, 2000. Later, however, when asked whether he had informed Buyer's principal, Mr. Csanadi, of the windfall issue and of the $41,362 amount of unshipped items being included in the $322,347 figure, Mr. Gasbarro responded, "Not in so many words." When faced with such inconsistent testimony, the Examiner was essentially required to make a determination as to the credibility and weight to be afforded the testimony of Seller's witnesses as to whether the parties reached an oral agreement as Seller asserts. This Court thus must defer to the Examiner's determination as to the credibility and weight to be given the testimony and evidence.
Finding no evidence that the Examiner's factual determinations were clearly wrong, those findings are entitled to substantial weight and deference by this Court. Consequently, this Court accepts, as a matter of fact and law, the Examiner's determination that the evidence does not support a finding that there was an oral agreement formed between the parties that the $41,362 amount of unshipped items are included in the $322,347 figure for "Eligible Accounts Receivable" and that $41,362 is a valid setoff claim.[8]
The amount of $41,362 is a valid Buyer setoff from the total amount Buyer owes Seller under the Note. Adding the agreed upon setoff figure of $15,126.87 to this $41,362 amount results in a total allowable setoff by Buyer of $56,488.87 from the $100,000 amount that it owes Seller under the Note.
 B. Buyer's Limited Objections to the Examiner's LegalConclusions
Buyer objects to certain legal conclusions made by the Examiner: namely, his determination that interest should accrue on the Note at the rate of 18% from January 5, 2002 until August 18, 2006, that Seller is entitled to reasonable attorney's fees incurred in its February 2006 *Page 13 
Superior Court action, and that Buyer is not entitled to reasonable attorney's fees as to the $15,126.87 amount of adjustment items but is only entitled to recover 73.22% of its reasonable attorney's fees. Buyer does not challenge any of the Examiner's factual findings.
 1. Interest Accrual on the Note
Buyer contends that the Examiner's legal conclusion that interest should accrue on the Note was erroneous because it ignores the plain language of the § 3.05(b) of the Purchase Agreement that reads:
 With respect to any claim that the buyer may have against Seller, other than a claim arising out of an Uncollected Eligible Accounts Receivable, the Buyer shall give the Seller written notice of any claim and proposed setoff. Unless the Seller shall, within fifteen (15) days of said notice, notify the Buyer of its dispute of the setoff, the Buyer may set off the amount set forth in the notice. If the Seller provides a notice of dispute, the Buyer may at its option either pay the amount to the Seller without prejudice to its claim, or pay the amount to Hinckley, Allen and Snyder, LLP, as Escrow Agent, to hold in an interest bearing account, and all interest earned on the escrow shall be deemed as part of the escrow until the dispute is resolved. The provisions of Exhibit 3 shall apply to the Escrow Agent.
(Emphasis added).
Buyer contends that the Examiner disregarded the "may" language in § 3.05(b) that gave Buyer the option of whether to pay the disputed sums, and instead read the word "shall" into that provision. While admitting that it could have stopped the accrual of interest on the undisputed amount of $43,511.13 by paying that amount to Seller, Buyer argues that the payment of that sum would have resulted in serious adverse consequences to it, namely, it would have surrendered its perfected security interest in the collateral and its claim for reasonable attorney's fees now would be an unsecured claim against Seller's estate. To avoid surrendering its *Page 14 
collateral and becoming an unsecured creditor with respect to its attorney's fees, Buyer asserts that it refrained from paying the undisputed amount of $43,511.13 and relied on the contractual provisions of its agreement with Seller that mandated a speedy, expeditious resolution by arbitration of the validity of the setoff claim. Buyer also takes issue with the Examiner's conclusion that a payment by Buyer to the Escrow Agent would have constituted a payment under the Note, arguing that such payment would have produced the same result as no payment at all, namely, Buyer would have retained its collateral and interest would have continued to accrue.
Buyer further suggests that Seller engaged in obstructionist conduct by failing to comply with its statutory duties, thereby precluding Buyer from obtaining an adjudication of the validity of its setoff claims through contract-mandated arbitration and necessitating the appointment of the Examiner. Buyer maintains, therefore, that to permit the accrual of interest on the Note would be to reward Seller for its obstructionist conduct.[9] Buyer contends that while the Examiner referenced some of this conduct in his Report, he ignored most of it in reaching his recommendation, thereby disregarding Buyer's equitable tolling arguments and committing fundamental legal error. For all of these reasons, Buyer claims that any and all interest under the Note should be equitably tolled.
This Court reviews de novo any questions of law that are premised on contract interpretation. Rodrigues v. DePasqualeBldg. and Realty Co., 926 A.2d 616, 623 (R.I. 2007). When construing contract provisions to determine the parties' intent, the maxim "expressio unius est exclusio alterius," that literally means "the expression of the one is the exclusion of the *Page 15 
other," is instructive. Gorman v. Gorman,883 A.2d 732, 738 n. 9 (R.I. 2005). If the parties to a contract specifically name one item or enumerate several items of a larger class, "a reasonable inference is that they did not intend to include other, similar items not listed." Id.
It also is a fundamental principle of statutory construction that "statutory language should not be viewed in isolation." Inre Brow, 903 A.2d 147, 149 (R.I. 2006). Consequently, in construing a statute, this Court must "consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." Sorenson v. ColibriCorp., 650 A.2d 125, 128 (R.I. 1994).
Applying these precepts to the Purchase Agreement in this case, this Court finds that § 3.05(b) sets forth the two situations in which Buyer can exercise its right to setoff: (1) where any eligible account receivable is uncollected within 120 days of closing; and (2) where the Seller fails to timely disprove a claim of setoff by Buyer after being put on written notice of such claim by Buyer.
This dispute, however, involves neither of those scenarios. According to the Purchase Agreement, where a matter involves timely disputed amounts unrelated to an uncollected eligible account receivable, Buyer does not have a right to withhold payment or to set off the disputed amount from what it owes under the Note. The use of the word "may" does not create a third option — namely, not to pay the disputed amount at all — but rather, gives Buyer an option of making payment either to Seller directly or to the Escrow Agent. Applying the maxim of "expression unius est exclusio alterius," the implication is that Buyer's proposed option of retaining the funds and not paying anyone does not exist; if it did, it would have been expressly stated. Consequently, § 3.05(b) does not grant Buyer the discretion not to pay the disputed amount, but rather, to decide who to pay — the Seller or the Escrow Agent. Furthermore, had *Page 16 
Buyer paid the disputed amount of $56,488.87 to Seller, it would not have forfeited its claims with regard to that amount since § 3.05(b) provides that payment by Buyer would be "without prejudice to its claim." If it paid that sum to the Escrow Agent, it would be available to be reimbursed to Buyer, with accumulated interest, if Buyer resolved the dispute in its favor.
With respect to the balance of $43,511.13, that represents the undisputed amount, [10] Buyer contends that it had a general right to set off this amount and that, had it paid that sum to Seller or the Escrow Agent, it would have surrendered its perfected collateral, namely, its right of setoff, [11] and its claim for reasonable attorney's fees now would be an unsecured claim against Seller's estate. The flaw in this argument is that it presupposes that Buyer had such collateral — namely, the right to setoff — as to the undisputed items in the first place. A close reading of § 3.05(b) indicates no right to setoff for Buyer under these circumstances with respect to the $43,511.13 amount.
Moreover, as to the two situations where a setoff would be permissible — neither of which applies here — Buyer still would be obligated to provide Seller with written notice of any claim and proposed setoff. Even if this Court were to accept,arguendo, that Buyer had the right to set off the amount of $43,511.13 in the first instance, therefore, Buyer never provided Seller with the requisite written notice of such proposed setoff. Had it done so, then the requirements of § 3.05(b) would have been triggered in that the proposed setoff amount still would have been required to be paid either to Seller or the Escrow Agent. Regardless, therefore, Buyer had no right to set off the undisputed sum of $43,511.13 from the amount owing under the Note. *Page 17 
Buyer also asserts that it had a secured claim for attorney's fees incurred in contesting the disputed amount and that it set off the $43,511.13 amount from the amount owed under the Note because it did not wish to relinquish the possibility of being paid those fees from the $43,511.13 amount. A close reading of § 3.05(b), however, provides no justification for a right of setoff for that purpose. If Buyer believed that it had a right to attorney's fees to be credited against the $43,511.13, then it simply could have given notice that the entire amount of the Note, namely $100,000, or a greater part of it was disputed. Instead, it only proposed a setoff as to the disputed amount of $56,488.87, an event that triggered an obligation on Buyer's part to pay over, at the very least, the undisputed amount either to the Seller or the Escrow Agent. Buyer, therefore, has not demonstrated that the amount of $43,511.13 in undisputed items was perfected collateral pursuant to the terms of the Purchase Agreement entitling it to a general right to set off that amount. Buyer repeatedly concedes that the sum of $43,511.13 was "undisputed," yet it never paid it to Seller or the Escrow Agent.
Consequently, this Court holds that Buyer did not have a general right to set off the undisputed sum of $43,511.13. This amount should have been paid either to Seller or the Escrow Agent. As such, Buyer owes Seller $43,511.13 plus interest.
Buyer also contends that payment of the undisputed amount to the Escrow Agent would have produced the same result as making no payment at all since there is no indication in § 3.05(b) that payment to the Escrow Agent would constitute a payment under the Note. This contention is without merit. If Buyer had paid the undisputed amount to Seller or the Escrow Agent, it would have been in compliance with the requirements of § 3.05(b) and no interest would have accrued on that undisputed amount. By not doing so, it violated the Purchase Agreement and thereby became accountable for interest on the amount that it retained. *Page 18 
Finally, Buyer contends that any and all interest under the Note should be equitably tolled, effective January 5, 2002, because Seller engaged in obstructionist conduct. It argues first that Seller refused to participate in either of the two arbitration procedures outlined in the Purchase Agreement before January 5, 2002 — accountants' arbitration or arbitration through the American Arbitration Association — and, therefore, Seller, through its disingenuous and obstructionist conduct for eight years, has frustrated the speedy claims resolution process that the parties created under the Purchase Agreement to resolve claims before the date that the balance of the purchase price would be due, namely, January 5, 2002. Buyer asserts that if interest is permitted to accrue on the Note at 18% per annum, then Seller will be rewarded for its efforts to frustrate the claims resolution process.
In addition, Buyer argues that when Seller filed its receivership petition on September 30, 2003, Seller conceded that it could no longer conduct its affairs because no one was willing to serve as an officer or director of the company such that it was legally incompetent to honor its contractual commitment to Buyer to resolve Buyer's claims. If interest is permitted to accrue on the Note after this admission of legal incompetence, Buyer contends that it would permit Seller to benefit from that legal incompetence.
Buyer argues further that Seller sought and obtained a legal stay from the Superior Court on October 1, 2002 that halted all proceedings against it, including arbitration. According to Buyer, to permit interest to accrue against it notwithstanding entry of the stay order would permit Seller to achieve a financial advantage while Buyer was lawfully stayed from resolving its claims.
Finally, Buyer argues that interest should be denied simply because it filed for receivership, and the Receiver failed in his duties. According to Buyer, the Receiver was *Page 19 
supposed to be impartial and neutral and was obligated to file a report recommending allowance or disallowance of Buyer's claim within a reasonable time after the bar date for filing claims. Yet, the Receiver did not file his recommendation until two years had passed since the bar date and only because the Court ordered him to do so at Buyer's request. Rather than serve as an impartial receiver, Buyer contends that the Receiver acted as Seller's advocate and did not remain neutral in his investigation. As a result of his alleged failure to perform his duties, Buyer argues that it was compelled to seek the appointment of an independent examiner. In Buyer's view, to permit interest to accrue on the Note would be to reward Seller for the Receiver's dereliction of duties.
Buyer takes great pains in its memoranda to support its equitable tolling arguments on the basis of Seller's alleged obstructionist conduct during the eight-year period from January 2001 until now. This Court, however, does not need to reach the merits of those claims because it finds that Buyer had a contractual obligation to pay the undisputed amount of $43,511.13 as of January 5, 2002 or interest would accrue. As discussed earlier in this Decision, Buyer never gave Seller written notice of a dispute as to the $43,511.13 amount and, therefore, by Buyer's own admission, this amount was undisputed and should have been paid. Although Buyer describes in detail in its earlier memorandum why Seller's alleged obstructionist conduct should toll interest under the Note with respect to the disputed amount of $56,488.87, [12] it is significant to this Court that Buyer never explains why Seller's conduct should toll interest with respect to the undisputed amount of $43,511.13. While this Court acknowledges and agrees with Buyer's arguments that obstructionist conduct should not be rewarded, it finds that any such alleged conduct on Seller's part is irrelevant with respect to the accrual of interest on the undisputed *Page 20 
amount of $43,511.13 because this amount should have been paid as of January 5, 2002, pursuant to the Purchase Agreement, regardless of any alleged obstructionist conduct on Seller's part. Had interest been assessed by the Examiner as to the disputed amount of $56,488.87, then the merits of Buyer's obstructionist conduct claims against Seller might be relevant.
Consequently, this Court does not need to reach the merits of whether Seller engaged in such conduct in this case as it finds that, pursuant to the parties' Purchase Agreement, Buyer should have paid the undisputed sum of $43,511.13 as soon as that amount became due on January 5, 2002 and its failure to do so triggered the accrual of interest which did not end until August 18, 2006, the date when the Receiver filed its report and review of Buyer's Proof of Claim. Buyer is thus responsible to pay the undisputed amount of $43,511.13 plus interest at 18% under the Note from January 5, 2002 until August 18, 2006, bringing the total balance due by Buyer under the Note to $79,407.84.
 2. Attorney's Fees
Buyer challenges the Examiner's legal conclusion that Seller is entitled to its reasonable attorney's fees in connection with its February 2002 Superior Court action to collect on the Note. Buyer asserts that the Examiner's legal conclusion was based on the same erroneous construction of § 3.05 discussed with regard to interest, namely, that Buyer was required to pay the undisputed amount of $43,511.13 under the Note to either Seller or the Escrow Agent.
Since Buyer was required to pay the undisputed amount of $43,511.13 either to Seller or the Escrow Agent pursuant to § 3.05(b) of the Purchase Agreement, that sum became due as of January 5, 2002; otherwise, interest would begin to accrue. Having paid nothing under the Note and having failed to provide written notice to Seller of any claim or dispute regarding the *Page 21 
$43,511.13 amount, Seller was entitled to bring a court action to collect on the Note. As discussed in this Decision, Buyer at least should have paid the undisputed amount of $43,511.12 under the Note, or, alternatively, disputed all or a greater part of the $100,000 under the Note while still paying that sum to the Seller or the Escrow Agent. Buyer's failure to pay or dispute all or some portion of the undisputed amount triggered Seller's right to pursue litigation to enforce payment of the undisputed amount due under the Note (totaling $43,511.13), and Seller is entitled to recover its reasonable attorney's fees incurred in that action.
Buyer also challenges the Examiner's legal conclusion that Buyer is not entitled to attorney's fees as to the $15,126.87 of adjustment items and the Examiner's concomitant award to Buyer of 73.22% of its attorneys' fees as to the disputed amount.[13] An examination of the record indicates that prior to May 2001, Seller's accountant had agreed to the $15,126.87 adjustment figure. In his May 11, 2001 letter, however, Mr. Batty renounced Seller's accountant's figure and informed Buyer that Seller would review those proposed adjustments, advise Buyer whether Seller agreed or disagreed, and then designate an accountant to resolve any disputes. Despite Seller's disagreement with the proposed adjustment, it never designated an accountant to resolve the issue and never provided any other information regarding those adjustments to Seller. After approximately eight years of extensive litigation, Seller finally conceded that the $15,126.87 would no longer be contested, a point which the Examiner highlights in his Report. Yet, the Examiner concluded that there does not appear to be a provision in the Purchase Agreement entitling Buyer to attorney's fees with respect to the $15,126.87 amount.
Section 20.01 of the Purchase Agreement, entitled "Indemnification by Seller," reads: *Page 22 
 Seller shall indemnify and hold harmless Buyer . . . from and against any and all liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including reasonable legal costs and expenses, whether or not legal proceedings are actually filed) suffered or incurred . . . arising out of or resulting from (a) the breach of any covenant or agreement by Seller contained herein or in any agreement delivered in connection herewith, or (b) the material breach by Seller of any representation or warranty contained herein. . . .
Having agreed to the $15,126.87 of adjustment items and then reneging on its accountant's calculations with the assurance made to Buyer that Seller would review the figures and designate an accountant to resolve any disputes, which it failed to do for almost eight years, it is clear to this Court that Seller breached a "covenant or agreement" with Buyer to designate an accountant to quickly resolve the dispute over the $15,126.87 amount of proposed adjustments. Instead, it allowed extensive litigation to ensue and its associated costs to escalate until recently, when it finally conceded that it would not contest the $15,126.87 adjustment amount. There is no evidence that Seller's contest of that portion of the adjustment amount presented any justiciable issue of law or fact.See R.I. Gen. Laws § 9-1-45. Consequently, this Court holds that Buyer may recover 100% of its reasonable attorney's fees connected with the total overall amount of adjustment items and disputed amount of $56,488.87.
 CONCLUSION
For the reasons set forth in this Decision, this Court adopts the Examiner's Report and Recommendation in part and rejects it in part. This Court accepts as not being clearly erroneous the Examiner's factual finding supporting his legal conclusion that the amount of $41,362 is a valid setoff by Buyer from the amount due by Buyer to Seller under the Note and that Buyer does not owe this additional amount to the Receivership estate. As such, the Receiver's limited objection as to this finding is rejected. Buyer's limited objection to the Examiner's *Page 23 
recommendation that interest should accrue on payments due under the Note is likewise rejected as the undisputed amount of $43,511.13 should have been paid by Buyer under the Note as of January 5, 2002. As a result of Buyer's failure to pay or contest that amount, interest on that amount has accrued at 18% per year from January 5, 2002 until August 18, 2006, bringing the total balance due under the Note by Buyer to Seller to $79,407.84. Buyer's limited objection to the Examiner's recommendation that Seller is entitled to its reasonable attorney's fees incurred in its February 2002 Superior Court action is also rejected. However, this Court sustains the Buyer's limited objection to the Examiner's recommendation that Buyer is not entitled to attorney's fees as to the undisputed $15,126.87 amount of adjustment items that led him to award Buyer only 73.22% of its reasonable attorney's fees; instead this Court awards Buyer 100% of those fees.
Counsel for the parties should confer and submit to this Court forthwith for entry an agreed upon form of order that is reflective of this Decision. The Examiner is directed to confer forthwith with the parties in an effort to resolve their respective claims for attorneys' fees and to address any other outstanding issues in dispute. This matter is scheduled for further status conference on November 20, 2009 at 9:30 a.m.
[1] On or about January 9, 2001, Buyer changed its name to "The Standard Nut Bolt Company" and Seller, originally known as "The Standard Nut Bolt Company," changed its name to Abbott Street Realty, Inc.
[2] Section 3.05, entitled "Setoff," reads:
 (a) The Buyer shall have the right, after notice to the Seller, to set off against payments due by the Buyer to the Seller under this Agreement, the amount of any obligations due from the Seller under this Agreement, resulting from any Eligible Accounts Receivable which are not collected ("Uncollected Eligible Accounts Receivable") within 120 days of Closing.
[3] After Seller responded to Buyer's written notice of a claim for setoff in which it refused to pay the purchase price adjustment in the amount of $52,238 demanded by Buyer, Buyer filed a Miscellaneous Petition in the Rhode Island Superior Court alleging that the parties had submitted the issue of the purchase price adjustments to their respective accountants pursuant to § 3.01(c) of the Purchase Agreement as a valid and binding arbitration proceeding and seeking confirmation of the "arbitration award" of $52,238. Seller responded by submitting an affidavit of its accountant in which he asserted that he had not understood that he was serving as an "arbitrator" on behalf of Seller when he agreed to the purchase price adjustments. At a hearing on July 31, 2001, the hearing justice explained that the Court could not bind Seller to the accountants' calculations of purchase price adjustments because Seller's accountant had not understood that he was acting as an arbitrator pursuant to § 3.01(c) of the Purchase Price Agreement. Consequently, the parties agreed to resolve their dispute pursuant to the rules of the American Arbitration Association ("AAA") that are outlined in § 3.05 of the Purchase Agreement. Buyer then dismissed the Miscellaneous Petition that it had filed with the Court and filed a Demand for Arbitration. At the arbitration proceeding, Seller moved to dismiss for lack of jurisdiction by the AAA on the basis that Buyer's claims were not properly "arbitrated" pursuant to § 3.01(c) of the Purchase Price Agreement. The AAA granted this motion finding that the claims must be arbitrated pursuant to § 3.01(c) which requires the appointment of a mutually agreed upon third accountant to determine the appropriate Purchase Price adjustments.
On February 7, 2002, Seller commenced a Superior Court action to collect on the $100,000 Note that by then had become due. Buyer asserted a counterclaim against Seller for breach of the Purchase Agreement alleging that Seller had misrepresented its assets and liabilities to the extent of $52,238 and that Seller had refused to pay Buyer or allow it to set off $52,238 against the Note. On April 26, 2002, Seller filed a motion to dismiss or, in the alternative, to stay Buyer's counterclaim, arguing that it was subject to arbitration and not litigation. On July 31, 2002, Seller then filed a motion for summary judgment to collect on the Note, claiming that Buyer failed to provide timely written notice of its claims and failed to participate in a meeting of the parties' principals in violation of § 3.05 of the Purchase Agreement. On October 1, 2002, the hearing justice heard and denied Seller's motions to dismiss and for summary judgment but granted its motion to stay Buyer's counterclaim. On December 17, 2002, Buyer notified Seller that it was ready to arbitrate the purchase price adjustment claims pursuant to § 3.01(c), but Seller disagreed that these claims were arbitrable and refused to designate an accountant. This receivership action followed.
[4] The Examiner's initial Report and Recommendation was dated February 9, 2009. Following the parties' limited objections to his recommendations, the Examiner, at the Court's request, submitted a Supplemental Report dated May 1, 2009 to address those objections and arguments. On June 30, 2009, in response to questions raised by this Court, the Examiner submitted his Third Report and Recommendation. For purposes of clarity, references in this Decision to the Examiner's Report include all three of his submissions.
[5] See also Dickinson, 1982 WL 609164 *4 (A finding of fact is "clearly erroneous" when the "totality of the evidence leaves the reviewing court with a definite and firm conviction that a mistake has occurred.") (internal quotation omitted).
[6] Cf. U. S. v. Fairway Capital Corp.,433 F. Supp.2d 226, 231 (D.R.I. 2006) (citing Federal Rule of Civil Procedure 53(g)(1), (3)-(4) and stating that "a district court must decide de novo all objections to . . . and conclusions of law made or recommended by a master before ruling on the master's recommendations") (emphasis added).
[7] "A mixed question of law and fact is one in which the rule of law is undisputed, and the issue is whether the facts satisfy the legal standard." Direct Action for Rights andEquality v. Gannon, 819 A.2d 651, 662 (R.I. 2003) (quotingPullman — Standard v. Swint,456 U.S. 273, 289 n. 19 (1982)).
[8] Because the Examiner found that the $41,362 amount was a valid setoff claim, he recommended that this amount should be resolved in favor of Buyer and that no interest be assessed on that figure.
[9] Buyer directs this Court to its initial Submission to the Examiner dated August 25, 2008 in which it details Seller's alleged obstructionist conduct as well as the conduct of the Receiver who assumed control over Seller's assets and affairs in the receivership case.
[10] The $100,000 Note minus the amount of disputed items totaling $56,488.87 (that comprised $41,362 of unshipped items plus $15,126.87 of agreed upon adjustment items) leaves a balance of $43,511.13 — the undisputed amount.
[11] Buyer cites to Couture v. Pawtucket Credit Union in which the Rhode Island Supreme Court described the right of setoff as a "security of the most perfect kind."765 A.2d 831, 836 (R.I. 2001).
[12] This amount reflects the figure agreed upon by the parties' respective accountants as Purchase Price Adjustments that would result in a credit to Buyer.
[13] Because the Examiner found that Buyer could not recover attorney's fees in connection with the $15,126.87 amount, he concluded that Buyer is only entitled to 73.22% of Buyer's reasonable attorney's fees in connection with its total overall claim of $56,488.87 of adjustment items (or $41,362).